Filed 7/7/22  In re Ella H. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ELLA H., a Person Coming Under the Juvenile Court Law. | |
| | D079778 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14646) |
| v. | |
| A.H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed in part, reversed in part, and remanded with directions.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

Four months after the juvenile court terminated her reunification services, A.H. (Mother) filed a petition for modification under Welfare and Institutions Code section 388 alleging changed circumstances.[1] Claiming she had maintained her sobriety and found suitable housing, Mother sought to have her two-year-old daughter Ella H. placed with her. The juvenile court denied the petition without holding an evidentiary hearing and proceeded under section 366.26 to order a permanent plan of guardianship. It authorized the guardians (the paternal grandparents) to move with their granddaughter to Texas without specifying the duration and frequency of Mother's visits with Ella once she also relocated there.

Mother contends the juvenile court abused its discretion by summarily denying her section 388 petition without an evidentiary hearing. As we explain, Mother's petition suggested that her circumstances were at best "changing" rather than "changed," and no hearing was required. Mother also challenges the court's visitation order, arguing the court abused its discretion in granting her unsupervised visits with Ella in Texas without specifying the frequency or duration of those visits. This claim is appropriately conceded by the San Diego County Health and Human Services Agency (Agency). We accordingly remand the matter for the limited purpose of allowing the juvenile court to specify the frequency and duration of Mother's visitation under the guardianship.

FACTUAL AND PROCEDURAL BACKGROUND

At birth, Ella tested positive for amphetamines and showed withdrawal symptoms. Ella's father N.W. (Father) told a social worker that Mother might have " 'slipped up' " and used methamphetamine toward the end of her

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

pregnancy. Mother acknowledged using methamphetamine up until the fourth or fifth month of her pregnancy, but said she was not sure how she and Ella tested positive for amphetamines when Ella was born. She would later admit relapsing the night before Ella's birth.

The Agency filed a petition under section 300, subdivision (b). Ella was removed from Mother's custody and placed in the care of her paternal grandparents. Twenty-nine at the time of Ella's birth, Mother admitted to the social worker that she had used drugs since the age of 14 and struggled with sobriety ever since. At the jurisdiction and disposition hearing in February 2019, the court declared Ella a dependent, required her to remain outside Mother's care, and ordered family reunification services for both parents. Mother's case plan included parenting education, substance abuse services, and substance abuse testing.

Over the next six months, Mother disclosed that she consumed alcohol but explained she did not consider it a relapse. Her visitation with Ella was consistent and progressed to unsupervised visits. She completed her court-ordered treatment services by September 2019. The Agency nonetheless raised concerns about Mother's sobriety after she failed to test twice and had a diluted test. It believed that Mother lacked insight into how her relationship with Ella's father and other users could impact her recovery and place Ella in danger. At a contested six-month review hearing in October 2019, the court continued family reunification services for Mother but terminated Father's services.

Mother continued to have regular and consistent visitation with Ella for the next several months. However, the Agency expressed concern that Mother continued to maintain contact with Father—who was actively using— given her admission that "being around people who use" had triggered her

3

past drug relapses. Mother admitted that she had been using drugs on and off for 15 years before Ella was removed from her care; her longest period of sobriety before the dependency case was three months. Acknowledging she was participating in substance abuse treatment, the Agency nevertheless believed that Mother lacked insight into what was required to maintain her sobriety and failed to establish boundaries with those who were actively using. It therefore recommended terminating Mother's reunification services.

In March 2020, in-person visitation was suspended due to the COVID-19 pandemic. Mother stopped communicating with the Agency around this time, raising questions as to her sobriety. She continued to associate with Father, who was actively using drugs. Troubled by her continued interaction with Father, her failure to test since the end of February, and her failure to communicate with the social worker, the Agency sought in August 2020 to revert Mother to supervised visits. The court denied that request, keeping visitation unsupervised. Mother continued to associate with Father and was arrested in October after an altercation between the two.

The contested 12-month review hearing was repeatedly postponed. The Agency noted in its April 2021 report that Mother missed three drug tests between December 2020 and March 2021. She admitted she did not complete a requested drug test because she had consumed alcohol. She additionally sent messages to friends asking for clean urine to pass a drug test, offering drugs, and asking to smoke a bowl. During a recorded conversation with Father, the Agency heard Mother audibly smoke a substance from what she identified as a bong. Due to these ongoing concerns, the Agency and Ella requested that Mother be required to submit to a hair follicle test. The court granted that request.

4

The contested 12-month review hearing was finally held in June 2021. In an addendum report filed before that hearing, the Agency noted that while it was clear Mother loved Ella, concerns lingered about her sobriety given her consistent contact with Father and failure to submit to a scheduled hair follicle test. Noting that Mother had used methamphetamine since she was a teenager and had parental rights terminated over her two older children "due to concerns over her long-standing substance abuse issues," the Agency indicated it lacked "definitive evidence that the mother has achieved, or maintained any prolonged sobriety." Once more, the Agency recommended terminating Mother's reunification services and setting a permanency planning hearing. Ella's counsel joined in that request, questioning Mother's sobriety and her ability to secure appropriate housing for Ella. Mother objected to setting a permanency plan and asked the court to return Ella to her care. Despite evidence of alcohol use, she "never had a positive test." Mother claimed she maintained her sobriety, interacted appropriately with Ella, and had obtained housing.

Adopting the Agency's recommendation, the court terminated Mother's reunification services at the 12-month review hearing. While commending Mother for completing her treatment programs and regularly and consistently visiting Ella, the court found circumstantial evidence that she was not sober. Throughout the pendency of the case, there was never any significant period of consistent negative tests, and there was concern about adulterated tests. While Mother had "on many occasions attempted in good faith and expended great energy in trying to overcome" her obstacles, the record indicated that she "has not maintained her sobriety, and that it is a significant remaining issue in the case." Terminating Mother's services, the court set a permanency plan hearing under section 366.26.

In a report filed in September, the Agency recommended terminating Mother's parental rights and ordering a permanent plan of adoption. The Agency expressed concern about an incident that took place in August: Mother arrived to pick up Ella for a visit and after a verbal altercation spit in paternal grandfather's face, prompting him to obtain a restraining order against her. The report noted that Mother wanted Ella returned to her care. Claiming she had maintained her sobriety, no longer associated with drug users, participated actively in Narcotics Anonymous (NA), and met regularly with her sponsor, Mother told the social worker she had made strides in getting her life together. The Agency discounted this proffer because Mother did not provide documentation of her progress or contact information for her sponsor when asked. The Agency indicated that Mother was currently living with her parents, and had been approved for Section 8 housing on her own. She was searching for employment but relying on unemployment insurance to meet her daily needs. Although the Agency acknowledged a parent-child relationship between Ella and Mother, it believed preserving that relationship did not outweigh the benefits of adoption.

Two weeks passed. In October, Mother filed a petition under section 388 seeking to modify the court's June 2021 order terminating her reunification services. Noting that services had been terminated "due to suspected substance abuse and unstable housing," Mother maintained she had addressed both concerns. She claimed she was living with her parents in stable housing that Ella could share and that she had maintained her sobriety by avoiding triggers and staying away from drug users. The petition also alleged that Mother continued to attend NA meetings and engaged with her long-time sponsor. Attached to her petition were two letters. The first was from her sponsor stating that Mother "has really been making an

attempt at changing her life around for the better" and "making smarter choices" by living with her parents and appearing for virtual NA meetings. A separate letter from a clinic indicated that Mother had attended 21 substance abuse treatment sessions between October 2020 and March 2021.

In an addendum report filed in November, the Agency opposed Mother's section 388 petition. It noted that Mother had yet to provide documentation of her continued efforts in maintaining sobriety or contact information for her sponsor. There was nothing in the Agency's record showing drug treatment after March 2021, and Mother's last drug test with the Agency was in April 2021. There was no indication Mother could financially provide for Ella. And although she said she was living with her parents, they told the social worker Mother did not reside in their home. As a separate matter, the Agency noted that the caregivers' restraining order against Mother complicated her visitation. Finally, despite Mother's claim that she was staying away from drug users, she was unable to provide the Agency with individuals who were cleared to pick up Ella given their criminal or substance abuse histories.

As to best interests, the Agency noted that Ella had "a relationship with her mother, enjoys her visits and expresses excitement when she visits with her." The paternal grandparents expressed interest in providing permanency through guardianship to maintain the parent-child relationship, and Mother was not in a position to care for Ella full time. For these reasons, it asked the court to summarily deny the section 388 petition. Moving on to Ella's permanent plan, the Agency amended its earlier stance and recommended legal guardianship to preserve Ella's established relationships with Mother and the maternal side of her family.

The court held a combined section 388 and 366.26 hearing on December 1, 2021. That morning, Mother amended her petition to provide her new residential address in San Marcos and pictures depicting a bedroom with a bed and children's play set. The Agency and Ella argued that Mother had failed to make a prima facie case of changed circumstances with respect to her sobriety to warrant an evidentiary hearing. When asked to comment, Ella's paternal grandfather said he did not believe Mother was staying clean and sober. Mother's counsel, by contrast, argued that her housing was stable; she had a clean room for Ella and necessities for her care; and even the Agency acknowledged the mother-child bond. Mother had never tested positive for drugs. Mother believed she met her burden to make a prima facie case of changed circumstances and best interests and was entitled to an evidentiary hearing.

Seeking clarification, the court asked Mother for details about her new residence. Mother stated she had not signed a formal lease but was staying there until she could save enough to get her own place. Mother had lived in that house with its five other occupants for about two months.

The court summarily denied Mother's petition, concluding she did not make a prima facie showing of changed circumstances. Mother claimed changed circumstances based on a new residence and continued sobriety. The court questioned Mother's claim of stable housing where she waited until the hearing date to share her new address and offered nothing more than a few photographs of a bedroom. Regarding Mother's continued sobriety, the court noted that nothing had changed. Mother had refused a drug test in May 2021, raising questions about her sobriety and prompting the court to terminate reunification services and set a section 366.26 hearing. Even if circumstances had changed, the court reasoned that Mother failed to

8

establish that placement with her would serve Ella's best interests. It again highlighted how little was known about Mother's living arrangements. With so many unknowns, the court could not find it would serve Ella's best interests to return to her mother's care.

Turning to the section 366.26 hearing, the Agency recommended a plan of legal guardianship with supervised visitation by video at least twice a month and in-person visits at least twice per year on Saturday and Sunday for four hours. Mother's counsel noted that this was less visitation than what Mother currently had. Ella's counsel agreed that Mother should have more frequent in-person visitation than twice a year.

The court adopted the Agency's recommendation to order a permanent plan of legal guardianship. Although Ella was likely to be adopted, it found that exceptions to terminating Mother's parental rights applied. First, Ella's current caretakers wished to pursue guardianship, and it would harm Ella to remove her from their care. Second, Ella had an established and positive relationship with Mother such that the beneficial parent-child relationship exception applied. It issued letters designating Ella's paternal grandparents as her legal guardians.

It was known to everyone by the time of this hearing that Ella's paternal grandparents had retired and wanted to move to Texas. The court allowed them to relocate to Texas with Ella in December. Until that date, Mother would have two unsupervised visits with Ella. Mother indicated that she wanted to move to Texas in the future. Because the paternal grandfather had an elder abuse restraining order against her, visitation in Texas would have to be coordinated through an intermediary—specifically, paternal grandfather's adult daughter Tracy. Tracy would arrange phone, video, and social media contact with Ella, as well as exchange letters or gifts with

9

Mother once the guardians moved to Texas. After Mother relocated there, Tracy would be "the intermediary to arrange for the mother's unsupervised visits on a daytime basis," with the parties agreeing "to the pickup and drop off and what the itinerary would be."

DISCUSSION

Mother raises two arguments on appeal. First, she claims the juvenile court abused its discretion in denying her section 388 petition without holding an evidentiary hearing. Second, she argues remand is necessary for the court to specify the frequency and duration of her visitation following her anticipated relocation to Texas. We reject the first claim but accept the second and send the matter back for limited proceedings to clarify the visitation order.

A.  *Section 388 Petition*

Section 388, subdivision (a) allows a parent to change, modify, or set aside a prior juvenile court order " 'if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist[,] and (2) the proposed change would promote the best interests of the child.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 205 (*Mary G.*).) A parent who makes a prima facie showing of both elements has a right to an evidentiary hearing, and the petition must be liberally construed in favor of granting a hearing. (*Ibid.*; see Cal. Rules of Court, rule 5.570(a).)

Despite the permissive standard, no hearing is required if the liberally construed allegations in the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the child's best interests. (*Mary G., supra,* 151 Cal.App.4th at p. 205; see *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157; Cal. Rules of Court, rule 5.570(d)(1).)

10

" 'The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at a hearing, would sustain a favorable decision on the petition.' " (*Mary G.*, at p. 205, citing *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62; see *In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.) A petition "must show *changed*, not changing, circumstances." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) We review the denial of a section 388 petition without an evidentiary hearing for abuse of discretion, reversing only if the court's ruling was arbitrary capricious, or patently absurd. (*Mary G.*, at p. 205; *In re G.B.*, at p. 1158.)

Applying that standard, we conclude no error occurred. Mother's section 388 petition alleged changed circumstances based on her continued sobriety and finding a new place of residence. The petition did not demonstrate a prima facie case of either.

As to her housing, Mother alleged in her October 2021 petition that she was living with her parents. In November, the Agency discovered this was untrue. Mother amended her petition on the day of the hearing to provide a new address and photos. In so doing, she demonstrated that her housing situation was at best changing, not changed. She admitted not having a lease or formal rental arrangement at her new address and reported that she was staying with a friend "for as long as I need in hopes that I'm going to get my own housing." The home was owned by a person named Wanda, who lived there with her two sons and two grandchildren. Mother claimed she had been staying there for the past month and a half or two months, since late October.

Mother's last-minute housing assertions were properly assessed in light of the procedural history of the case. When the dependency petition was filed, Mother was homeless and "bouncing around." Six months later, she was again homeless. She lived with Father or a different boyfriend at various points, and sometimes stayed with friends or her parents. Two months before the court terminated reunification services, Mother reported staying at a hotel and having no money. As of June 2021, the Agency did not know if she had located housing. By September, she was living with her parents and moved out a month later. Even crediting her assertion in December 2021 that she had lived with Wanda without any formal lease for the previous two months, Mother at best demonstrated that her housing situation might be *changing*.

The proffer was likewise deficient as to her sobriety. Despite the Agency's request, Mother failed to provide documentation to support her claim that she was sober and continuing with treatment. Mother had not drug tested since April 2021 or documented any treatment since March 2021. A letter from her sponsor stated Mother had been "making an attempt at changing her life around" and "making smarter choices," including by appearing for virtual NA meetings. But accepting this as true, Mother merely showed that circumstances were *changing*, not changed. The letter from the clinic corroborated what the parties and the court already knew— Mother attended substance abuse treatment through March 2021. Missing from Mother's offer of proof was any showing that she had become sober between the time of the June 2021 review hearing and her section 388 petition three months later. At the June hearing, the court commended Mother for expending energy in trying to maintain sobriety but expressed

concern with her missed and adulterated tests. Nothing in the petition suggested that circumstances had *changed*.

Mother admitted using methamphetamine since her teenage years. Over the fifteen years since, she struggled to maintain sobriety for more than three months at a stretch. She lost custody of her two older children due to her drug use. The court appropriately considered the entire factual and procedural history of the dependency case in summarily denying Mother's petition. And, given the severity of her drug problem, it could reasonably find that her alleged sobriety between June and December "was not particularly compelling." (*Mary G., supra,* 151 Cal.App.4th at p. 206.) Faced with similar records of lengthy substance abuse punctuated by intermittent periods of sobriety, courts routinely uphold the summary denial of a section 388 petition. (*Ibid.*; see also *In re Angel B.* (2002) 97 Cal.App.4th 454, 463 [although mother completed a drug program, her brief sobriety paled in comparison to her years of addiction, and she was unable to remain sober in the past even when the stakes involved losing her other child]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [despite her completion of a drug treatment program, mother's recent sobriety merely reflected *changing* circumstances given her history of relapses].)

Because Mother did not establish a prima facie case of changed circumstances, the juvenile court did not abuse its discretion in denying her petition without holding an evidentiary hearing.[2]

---

[2] Given this conclusion, we need not address whether Mother made a prima facie showing that returning Ella to her would promote the child's best interests.

B.    *Visitation Order*

Mother separately argued the juvenile court abused its discretion in failing to specify the frequency and duration of her visits under the guardianship.  The Agency appropriately concedes error and urges a limited remand to permit the juvenile court to specify the frequency and duration of Mother's visitation in Texas.

During the section 366.26 hearing, the juvenile court selected a permanent plan of guardianship.  Ella's paternal grandparents were selected as her legal guardians, and Mother was allowed unsupervised visitation.  An attachment to the letters of guardianship ordered that after Mother relocated to Texas, Ella's aunt Tracy would be the intermediary, facilitating Mother's unsupervised visits with Ella.[3]  But the court did not specify the frequency or duration of Mother's visits once she moved to Texas.

When a juvenile court selects a permanent plan of guardianship, it must order parental visitation "unless the court finds by a preponderance of the evidence that the visitation would be detrimental to the physical or emotional well-being of the child."  (§ 366.26, subd. (c)(4)(C).)  "The court has the sole power to determine whether visitation will occur."  (*In re E.T.* (2013) 217 Cal.App.4th 426, 439.)  Although it may give the legal guardians discretion over the time, place, or manner of visits, it may not delegate the frequency or duration of visits to the discretion of the guardian or an intermediary.  (*In re M.R.* (2005) 132 Cal.App.4th 269, 274.)  Here, the court's visitation order failed to give any indication about the frequency or duration of Mother's visits, effectively vesting discretion in Ella's guardians or in Tracy (the intermediary) to decide whether visitation would actually occur.

---

[3]    The attachment described Tracy as "the maternal aunt."  As Mother notes, Tracy was the daughter of Ella's *paternal* grandparents.

14

Remand is required to allow the juvenile court to add the necessary specifics to its order. (*In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314 (*Rebecca S.*); *In re E.T.*, at p. 439.)

## DISPOSITION

The portion of the order regarding visitation is reversed, and the matter is remanded to the juvenile court with directions to specify the frequency and duration of Mother's visits. (*Rebecca S., supra,* 181 Cal.App.4th at p. 1315.) The court in making an appropriate visitation order may of course consider current circumstances of the parties, including Mother's place of residence and any existing restraining order against her. In all other respects, the orders dated December 1, 2021, denying Mother's section 388 petition and selecting a permanent plan of legal guardianship are affirmed.

DATO, J.

WE CONCUR:

HALLER, Acting P. J.

BUCHANAN, J.